Filed 10/16/14  In re Paul M. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re Paul M. et al., Persons Coming Under The Juvenile Court Laws. | B251989 |
| _____ | (Los Angeles County Super. Ct. No. CK42835) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| R.M., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, S. Patricia Spear, Judge.  Affirmed.

Rich Pfeiffer, under appointment by the Court of Appeal, for Defendant and Appellant.

Amir Pichvai for Plaintiff and Respondent.

_____

R.M. (mother) appeals the order denying her Welfare and Institutions Code section 388 petition.[1] She contends new evidence requires a new trial on the jurisdictional finding that her son, Paul M. (born in 1999), sexually abused her daughters, L.P. and E.P. (born in 2006). We disagree and affirm the order.

## FACTUAL AND PROCEDURAL SUMMARY

This dependency case has been the subject of two previous opinions. We affirmed the jurisdictional and dispositional order in *In re Paul M.* (Jan. 30, 2013, B240325 [nonpub. opn.] (*Paul M. I*)). The order terminating mother's reunification services and returning Paul, but not the twins, to her custody was affirmed in *R.M. v. Superior Court* (May 14, 2014, B251998 [nonpub. opn.] (*R.M.*)). Mother commenced the writ proceedings in *R.M.* and the current appeal simultaneously to challenge rulings made at the same hearing. She filed the bulk of the record in that case and the "balance of record" in this. The parties extensively rely on the record in R.M., and we borrow some of the relevant facts and procedural history from that record and from our prior opinions.

In May 2011, a referral was made due to a concern about Paul's allegedly inappropriate sexual language and behavior. During the subsequent investigation, the twins "reported being hit by both Paul and appellant with various objects, including a hand, a shoe, and a belt. They also stated that Paul had touched their 'private parts' and that he made them 'eat it.'" After the first interview, mother instructed the twins not to talk about sexual contact with their brother. (*Paul M. I*, *supra*, at p. 2.) Mother represented herself at the jurisdictional hearing and chose to proceed on documentary evidence alone. The evidence included reports by the Department of Children and Family Services (DCFS) and declarations by mother. (*Id.* at pp. 4–5.) The court sustained DCFS's amended section 300 petition on several grounds, one of which was based on the alleged sexual abuse of the twins by Paul. (*Id.* at p. 5.) Mother was ordered to undergo a psychological evaluation, and to receive reunification services and

[1] Statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

monitored visitation.  (*Ibid*.)  On appeal, we concluded the twins' repeated claims of sexual abuse were sufficiently reliable to constitute substantial evidence, and the only evidence of coaching pointed to mother.  (*Id*. at pp. 8–9)  We upheld the court's overruling of mother's belated objection to DCFS's reports and the lack of live witness testimony.  (*Id.* at pp. 5–6.)

A contested 18-month review hearing took place over several days in August and September 2014.  A number of witnesses testified, but the parties rely on the testimony of social worker Rosita Brennan; mother's evaluator, Dr. Mitchell Harris; Paul's therapist, Dr. Jared Maloff; and the twins' therapist, Dr. Catherine Lippincott.

Brennan testified that during a monitored visit on July 30, 2013, Paul urged E.P. to report that the foster mother told the twins they were in foster care because "Paul put his penis in their mouth" and "gave them candy not to tell."  E.P. responded "that that didn't happen, and the foster mother told . . . her yes, it happened, and that's why they're in foster care."  Brennan also testified that E.P. stated social worker Rebecca Sampson had "told them to say that Paul put his penis in their mouth[s]."

Dr. Harris referenced E.P.'s statements, as reported by Brennan, as evidence supporting mother's doubts about the accuracy of the allegations of sexual abuse.  He expressed concern that the forensic interview with the girls was not videotaped, and wondered how the word "pee pee . . . morphed into penis," a word not typically used by a four-and-a-half-year-old child.

Dr. Maloff, who had seen the twins and Paul six times, testified the children did not exhibit sexualized behavior, and the twins were not afraid of Paul.  Dr. Maloff opined it was possible that Paul did not perpetrate the alleged sexual abuse because the twins, who were "very young" at the time were initially interviewed together, and he was "aware of the difficulty in interviewing children who are that young and retrieving factual statements."  Dr. Maloff found Paul's denial of the sexual abuse believable absent evidence to the contrary, but proceeded with his therapy "as if" the abuse had happened.

Dr. Lippincott testified the twins had had individual therapy sessions with her on a weekly basis since April 2012.  According to Dr. Lippincott, whenever they talked about

3

past events, such as physical or sexual abuse, the girls would became "anxious and dysregulated, hiding under chairs, rocking in the fetal position, and saying . . . what did I do, what did I do, I'm not supposed to tell you."

During the hearing, mother filed a section 388 petition based on new evidence. She referenced only Brennan's notes, where the visitation monitor stated that the twins recanted their sexual abuse allegations and that they had been unduly influenced by social worker Sampson and the foster parents to make false statements. Mother added that the twins had been incorrectly interviewed together. On the record, mother's attorney advised the court that mother was "very concerned about all the new evidence that's come out since July 30th and things that we put in the 388." The court denied the petition, stating that it was based on "the same evidence that we are trying at this very moment. There's nothing new that hasn't been reported in many other court reports. [¶] The court has a different view of some of the evidence that mother feels there's dramatic new evidence. The court does not believe there's any change in circumstances. The court does not believe there's a showing that the 388 is the proper vehicle. [¶] The court feels that the orders that mother wants are the orders that it is trying right now. And there is no point in trying the 388 separately. She wanted return, she wanted things that are impossible, like vacate everything that's been affirmed on appeal."

At the end of the hearing, the court terminated mother's reunification services, returning Paul to mother's custody, but not the twins. Mother challenged the termination of her reunification services in *R.M.*, *supra*, and simultaneously filed this appeal from the denial of her section 388 petition.

## DISCUSSION

Mother's only contention on appeal is that newly discovered evidence requires a retrial of the allegations of sexual abuse of the twins by Paul.

We review the summary denial of a section 388 petition for abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) To be entitled to a hearing on a petition to set aside an earlier order of the juvenile court, the petitioner must make a prima facie

4

showing that there is a change of circumstances or new evidence, and that the new order would be in the best interest of the child. (§ 388, subd. (a)(1); *In re Stephanie M.*, at p. 317.)

Mother analogizes this case to *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738 (*Blanca P.*). The children in that case were originally detained due to inappropriate discipline by the mother. The foster parents became concerned the parents' three-year-old daughter had an unusually wide vaginal opening. When asked repeatedly "if anyone touched her 'pee-pee,'" the girl responded with "my mom," "boy," and "my Pappy." A subsequent petition was filed alleging the father had digitally penetrated the girl's vagina. (*Id*. at p. 1742.) At the jurisdictional hearing on that petition, the judge admitted not having read it; he also had to be disabused of the impression that the allegation of sexual abuse already had been sustained. (*Id*. at p. 1744.) His jurisdictional and dispositional order was not appealed, but a subsequent Evidence Code section 730 evaluation exonerated the father of any propensity to sexually abuse children because the clinical findings were inconsistent with a diagnosis of incest or pedophilia. (*Id*. at pp. 1745, 1755.) At the 18-month hearing, the evidence indicated the parents had complied with their service plan but continued to deny the allegation of sexual abuse. (*Id*. at p. 1747.) A different judge terminated the parents' reunification services and found that return of the children to the parents' custody would be detrimental. (*Ibid*.)

The appellate court concluded that the Evidence Code section 730 evaluation cast doubt on the initial jurisdictional finding of sexual abuse, as did "the very circumstances of that initial finding." (*Blanca P*., *supra*, 45 Cal.App.4th at p. 1754.) It held that "collateral estoppel effect should not be given, at a 12- or 18-month review, to a prior finding of child molestation made at a jurisdictional hearing when the accused parents continue to deny that any molestation ever occurred and there is new evidence supporting their denial." (*Id*. at p. 1757.) The court noted that a section 388 petition may be an alternative remedy, but did not decide that issue. (*Id*. at p. 1759.)

*Blanca P*. is distinguishable. There, the evidence of sexual abuse was particularly problematic since the three-year-old's response that her father touched her private parts

5

could not fairly support the allegation that he penetrated her with his fingers, and the reviewing court was concerned about the circumstances under which the jurisdictional finding of sexual abuse was made. Mother raises no such concerns here. Her assertion that different judges presided at the jurisdictional and 18-month hearing is incorrect, as all relevant orders were made by Judge S. Patricia Spear. The jurisdictional and dispositional order, and the order terminating reunification services have been affirmed on appeal. Mother offers no reason why the law of the case doctrine should not apply to those orders. (See *Joyce v. Simi Valley Unified School Dist.* (2003) 110 Cal.App.4th 292, 304 [doctrine applies where issues substantially the same and no material change in evidence].)

The only evidence cited in the section 388 petition was visitation monitor Brennan's report of E.P.'s statements made on July 30, 2013, when E.P. reportedly disagreed with the foster mother's claim that the twins were in foster care because "Paul put his penis in their mouth[s]" and "gave them candy not to tell." She also reportedly claimed that social worker Rebecca Sampson had "told them to say that Paul put his penis in their mouth[s]." Initially, the foster mother's beliefs as to why the twins were in foster care are irrelevant because the girls made allegations of sexual abuse long before they were placed in foster care. Moreover, mother 's assumption that E.P.'s statements constitute new evidence is not supported by the record in *R.M.*, *supra*, on parts of which she selectively relies.

Early DCFS reports that were presented at the jurisdictional hearing indicate the girls began recanting their claims of sexual abuse early on because mother told them to do so. As early as the second interview with social worker Sampson, L.P. claimed she had lied or "mixed up the stories," adding that mother had told her '"no eating private parts'" and '"Paul would never do that.'" During the subsequent forensic interview, L.P. claimed she had lied about her brother's "penis," and refused to answer questions about it, saying only that "he was bothering us sometimes." E.P. reported L.P. had said she got candy if Paul '"puts [his] pee-pee in her mouth,'" but denied Paul ever did that to her. E.P. also said that L.P. "shouldn't have said that. . . . [¶] She shouldn't tell the truth. My

6

mom says I can't tell you." The twins similarly vacillated when interviewed by dependency investigator Woillard, in turn refusing to answer questions, claiming to have lied, but also admitting to have had sexual contact with their brother. Viewed in this context, E.P.'s reported recantation on July 30, 2013 cannot be new evidence.

The evidence presented at the jurisdictional hearing also indicates that early on mother began accusing DCFS, and in particular social worker Sampson, the first interviewer, of unduly influencing the twins. In her declarations, as well as during her visits with the twins, mother maintained her daughters were being instructed to say that Paul sexually abused them. She suggested Sampson had preconceived notions about Paul's sexualized behavior due to allegations in earlier referrals, even though they had been deemed unfounded, and she questioned the reliability of the initial and forensic interview absent an audio or video tape.

When interviewed by the dependency investigator, mother complained that the girls had been in the same room during the first interview, and E.P. had "copied" L.P. She suggested the girls had learned the phrase "'penis in the mouth'" during the interview. Sampson took issue with mother's accusation that the girls had learned the word "'penis'" from her, noting that the word was not used in the first interview, but L.P. already knew it by the second interview.

As we concluded in *Paul M. I*, *supra*, at page 9, there is evidence that mother herself unduly influenced the twins early on in the case. She berated them for making what she believed were false claims of sexual abuse, she discussed the case with social workers in the twins' presence, and she suggested that the twins were told by someone, possibly Sampson, what to say. The statements E.P. reportedly made on July 30, 2013, were thus substantially similar to statements included in the documentary evidence presented at the jurisdictional hearing. The court correctly concluded that the evidence on which mother's section 388 petition was based was not new.

Mother's contention that the court denied the section 388 petition without having heard all relevant evidence is contrary to the record. All witnesses on whose testimony mother relies in this appeal had testified before the petition was denied. To the extent

7

mother attempts to analogize the testimony of Drs. Maloff and Harris to the exonerating evidence in *Blanca P*., *supra*, 45 Cal.App.4th at page 1745, the claim is forfeited because this evidence was not cited in support of mother's section 388 petition. Allowing mother to rely on these witnesses' testimony for the first time on appeal would be unfair to the juvenile court. (*Steve J. v. Superior Court* (1995) 35 Cal.App.4th 798, 813.)

Even assuming the juvenile court denied mother's section 388 petition based on all the evidence adduced up to that point at the 18-month hearing, the denial of the petition was not an abuse of discretion. Drs. Maloff and Harris expressed the same concerns about the reliability of the initial interviews with the twins that mother had brought to the court's attention at the jurisdictional hearing—that the interviews were not electronically recorded, that the children were initially interviewed together, and that they picked up words unusual for their age. Mother was advised she could call witnesses at the jurisdictional hearing, and she claimed to have retained an expert witness, but she failed to call any such witness. (*Paul M. I*, *supra*, at pp. 4–5.) As she acknowledges, evidence that could have been presented earlier is not new evidence. (*In re H.S.* (2010) 188 Cal.App.4th 103, 109.) Thus, a "new expert's opinion that is based on old evidence available at the time of trial" does not qualify as new evidence. (See *ibid*.) Drs. Maloff and Harris's concerns about the reliability of the twins' claims cannot be new evidence.

Dr. Maloff's opinion that in the absence of other evidence, Paul's denial of the sexual abuse was credible was based on the assumption that the twins' claims were unreliable unless they were corroborated. But as we explained in our earlier opinion, uncorroborated hearsay statements by minors under 12 years of age are admissible in dependency cases so long as they are sufficiently reliable, and their reliability depends on the ""the time, content and circumstances of the statement[s]."" (*In re Lucero L.* (2000) 22 Cal.4th 1227, 1248.)" (*Paul M. I*, at p. 8.) We concluded the twins' statements were sufficiently reliable based on the evidence presented at the jurisdictional hearing, and the statements were therefore admissible without corroboration. (*Id*. at p. 9.) Other than his concern about the twins' young age and the fact that they were initially interviewed together, Dr. Maloff did not identify any problem with their statements. But the

children's age is not in itself relevant to the issue of reliability, and the fact that E.P. may have heard L.P.'s statements during the initial interview does not make L.P.'s own initial statements any less reliable.  In essence, mother asks us to second-guess our own previous decision based on evidence substantially similar to that presented at the jurisdictional hearing.  We decline to do so.

## DISPOSITION

The order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EPSTEIN, P. J.

We concur:

WILLHITE, J.

MANELLA, J

9